UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-070 (JWB/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S** |
| | ) | **SENTENCING** |
| | ) | **MEMORANDUM** |
| ASHLEY ANNE DYRDAHL, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and Kristian Weir and Thomas Calhoun-Lopez, Assistant United States Attorneys, hereby submits the following sentencing memorandum.

The government respectfully requests that the Court sentence defendant Ashley Anne Dyrdahl to a 41-month term of imprisonment. Dyrdahl provided a violent, depraved man with deadly weapons designed for combat and lethality. Predictably, that man then turned those weapons on others, murdering three courageous Burnsville first responders on the night of February 18, 2024. Dyrdahl's crime enabled this unthinkable act to take place. Without her, it would not have occurred. Her crime shattered three families and devastated our community.  Her sentence must reflect the direct consequences of her actions.

## I.      Introduction

In the early morning of February 18, 2024, after an hours-long standoff with law enforcement, Gooden unleashed a torrent of gunfire from two AR-15-style rifles at first responders who there to protect the public. Gooden's hail of bullets killed three first responders and wounded a fourth. These brave public servants were there to answer a call for help from inside Gooden's home and made the ultimate sacrifice in the line of duty.

Dyrdahl purchased the two murder weapons on January 5 and January 24, 2024, just weeks before the murders. She did so fully aware that Gooden was prohibited from possessing firearms owing to his prior conviction of a violent assault. Indeed, she purchased the weapons *for* Gooden because he could not—the law prohibited him from doing so, for good reason. He was violent and dangerous. Dyrdhal knew all too well Gooden's penchant for erratic violence. By her own admission, Dyrdahl lived in grave fear of Gooden's volatile and violent behavior. Over the course of just five months in 2024, the defendant gave this dangerous man at least five firearms. She handed him the means to murder, literally placing these combat weapons in his hands.

A sentence of 41 months' imprisonment is necessary to provide just punishment for this horrific crime, which cost the lives of three heroic men and injured a fourth. It is also necessary to punish Dyrhdahl and to deter others

from enabling violent people access to dangerous weapons.

## II.    The Murders of Paul Elmstrand, Matthew Ruge, and Adam Finseth.

At just past 2:00 a.m. on February 18, 2024, law enforcement officers responded to a report of possible child sexual abuse at a Burnsville home. (ECF No. 48 (PSR) ¶¶ 10, 20). When law enforcement arrived, Dyrdahl rushed out of the house, leaving Gooden alone with seven minor children. (PSR ¶ 11). Officers quickly established a tactical stance and began attempts to negotiate with Gooden, who had barricaded himself in a second-story bedroom in the home, effectively taking the children hostage. (PSR ¶ 12). After hours of negotiation, Gooden told law enforcement he would come out peacefully; instead, he opened fire with a .300 caliber Franklin Armory AR-15-style rifle equipped with a binary[1] trigger. (PSR ¶ 12). In the ensuing chaos, with several children in the bedroom with him, Gooden fired over 100 rounds from the Franklin Armory rifle and another AR-15-style Palmetto State rifle into the unsuspecting officers and paramedics inside and outside the home. (PSR ¶ 12).

The responding officers were aware that Gooden was armed, and the hours-long standoff had allowed them time to fully prepare with tactical armor, shields, and all necessary precautions. It did not matter. Gooden's .300 caliber

---

[1] A firearm with a binary trigger fires one shot when the trigger is pulled, and another when the trigger is released, effectively doubling the rate of fire.

Blackout ammunition blew through their tactical precautions and struck Burnsville Police Officers Paul Elmstrand, Matthew Ruge, and Adam Medlicott. (PSR ¶ 13). The officers fled the house and attempted to take cover outside, where Firefighter EMT Adam Finseth rushed to provide medical aid to the wounded officers. (PSR Victim Impact Statement 3). As he did, Gooden took aim and shot Finseth in the midst of his life-saving efforts. *Id.* Elmstrand, Ruge, and Finseth died of their wounds. (PSR ¶ 13). Gunfire from Gooden's high-powered weapons lasted an astonishing 15 minutes. (PSR Victim Impact Statement 3). Eventually, Gooden was shot in the leg, at which point took his own life with a Glock G47 pistol. (PSR ¶ 13). Before he did, Gooden asked two of the children in the house if they wanted to die with him. (PSR ¶ 20).

After Gooden's death was confirmed, officers entered the bullet-ridden home to find the bedroom filled with an arsenal of weapons and ammunition. Amidst the detritus, officers found the two assault rifles used to murder the first responders—equipped with large-capacity magazines—three pistols, a shotgun, and an additional Palmetto State assault rifle with a large-capacity drum magazine in an open gun case. (PSR ¶ 14, photos below).



Fig. 1: The Franklin Armory rifle equipped with binary trigger fired at first responders.



Fig. 2: The Palmetto State rifle fired at first responders, found on the bed near Gooden.



Fig. 3: A second, unfired Palmetto State AR-15-style rifle with large-capacity drum magazine found on the same bed.



Fig. 4: Cannisters with hundreds of rounds of ammunition for the assault rifles, found on the floor of the bedroom.



Fig. 5: Another cannister containing a Glock pistol and numerous loaded magazines.

Every firearm recovered from the scene of the shootout had been purchased by Dyrdahl and provided to Gooden by Dyrdahl.

### III.    The Conspiracy to Arm Shannon Gooden

Investigators quickly learned that Gooden had a prior conviction of second-degree assault and was legally prohibited from possessing any of the firearms used to murder the first responders. ATF records showed that Dyrdahl had purchased every firearm used on February 18, and more. (PSR ¶ 9).

6

Dyrdahl initially told investigators that she purchased the firearms as part of her own personal firearm collection; she claimed it was a hobby of hers. (Gov't Ex. 2, Feb. 20, 2024 Statement of Ashley Dyrdahl to BCA at 1:30-2:01). She insisted that they were hers, and Gooden never possessed them without her permission. (*Id.* at 3:34-4:05.) Law enforcement quickly determined that the firearms had all been purchased at Gooden's request during a months-long conspiracy between Dyrdahl and Gooden. (PSR ¶ 9). Text messages between Dyrdahl and Gooden establish a clear pattern in which the two openly discussed which firearms Dyrdahl would buy for Gooden. (PSR ¶ 9). Each of the firearms recovered from the scene was traced to a text conversation between Dyrdahl and Gooden, including the assault rifles used to murder the first responders. Those assault rifles were purchased in January 2024, weeks before the shooting. (PSR ¶ 9). Dyrdahl ordered the Franklin Armory assault rifle with a binary trigger on January 5, 2024, less than six weeks before it was used to attack first responders in February. (PSR ¶ 9). Dyrdahl even updated Gooden on January 6, 2024, with details of when she went to Modern Sportsman in Burnsville to take possession of the firearm, noting that she knew it was equipped with a binary trigger. On February 10, Gooden went to the Modern Sportsman gun range with his new firearm. He texted the defendant that his "300 B.O. RAN SMOOTH" and sent the defendant a photo of the gun. The two then had the following exchange:



**From:** +16124349647 Baby Love
**To:** +16124086308 Voicemail (owner)

**That's your 300 blackout?**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124086308 Voicemail | | 2/10/2024 4:44:21 PM(UTC +0) | |

Status: Read

2/10/2024 4:44:21 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B1F83 (Table: message, handle; Size: 132726784 bytes)

---

**From:** +16124349647 Baby Love
**To:** +16124086308 Voicemail (owner)

**Wow**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124086308 Voicemail | | 2/10/2024 4:44:27 PM(UTC +0) | |

Status: Read

2/10/2024 4:44:27 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B1D64 (Table: message, handle; Size: 132726784 bytes)

---

**From:** +16124349647 Baby Love
**To:** +16124086308 Voicemail (owner)

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124086308 Voicemail | | 2/10/2024 4:44:33 PM(UTC +0) | |

Status: Read

2/10/2024 4:44:32 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B1B75 (Table: message, handle; Size: 132726784 bytes)

8



From: +16124086308 Voicemail (owner)
To: +16124349647 Baby Love

**It's nasty bae**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124349647 Baby Love | 2/10/2024 4:44:41 PM(UTC+0) | 2/10/2024 4:44:41 PM(UTC+0) | |

Status: Sent

2/10/2024 4:44:41 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B1976 (Table: message, handle; Size: 132726784 bytes)

From: +16124349647 Baby Love
To: +16124086308 Voicemail (owner)

**hell yeah**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124086308 Voicemail | | 2/10/2024 4:44:55 PM(UTC+0) | |

Status: Read

2/10/2024 4:44:55 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B173E (Table: message, handle; Size: 132726784 bytes)

From: +16124086308 Voicemail (owner)
To: +16124349647 Baby Love

**Thanks for making me so happy**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124349647 Baby Love | 2/10/2024 4:45:23 PM(UTC+0) | 2/10/2024 4:45:23 PM(UTC+0) | |

Status: Sent

2/10/2024 4:45:22 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0x42B131C (Table: message, handle; Size: 132726784 bytes)

From: +16124349647 Baby Love
To: +16124086308 Voicemail (owner)

**You're welcome baby thank you for making me so happy to and all the kids**

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16124086308 Voicemail | | 2/10/2024 4:46:44 PM(UTC+0) | |

Status: Read

2/10/2024 4:46:43 PM(UTC+0)

Source Info:
00008110-000679913ED9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db : 0x42B2F83 (Table: message, handle; Size:
132726784 bytes)

Video surveillance from Modern Sportsman showed that Gooden took the firearm to the Modern Sportsman gun range again on February 17, 2024, the day before the shootout. (Gov't Ex. 1, Feb. 17 Modern Sportsman Surveillance.) In the footage, Gooden empties a full magazine in a matter of seconds thanks to the rapid-fire capabilities of the binary trigger. *Id.*

The day before her interview with the BCA in which she claimed she bought the firearms for herself and not Gooden, Dyrdahl exchanged texts with Gooden's previous romantic partner and mother of three of the children left in the house with Gooden during the shootout. In private texts, Gooden's previous partner acknowledged that Gooden had abused her. Gooden's prior partner then informed Dyrdahl that Dyrdahl's efforts to help Gooden regain his gun rights and her purchase of the firearms had been publicized. In this private conversation, the defendant responded:



Law enforcement thoroughly searched the defendant's home in the aftermath of the February 18 shooting. They found no firearms in the home except those purchased by Dyrdahl. Additional investigation found no evidence that Gooden owned any firearms since his felony conviction aside from those that Dyrdahl purchased and provided him.

## IV. Argument

Paul Elmstrand, Matthew Ruge, and Adam Finseth would be alive today if the defendant had not armed Shannon Gooden with these lethal weapons. No one else was willing to buy firearms for Shannon Gooden. His friends and family never did. His ex-partner and victim of his abuse never did. Dyrdahl's reckless purchase of firearms for a man she *knew* could not possess them—and

11

who she knew was dangerous— directly led to the deaths of three brave first responders who were attempting to protect the defendant's own children from the monster in their house. The sentence in this case must account for the seriousness of this crime and its horrific consequences.

The photos and the harrowing eyewitness descriptions from officers who survived the shooting describe a scene more like a warzone than a south metro suburb. One officer described shrapnel from the walls and concrete floor striking him from all directions; the bodies of the fallen responders stacked on top of one another inside an armored vehicle; the driver of the armored vehicle worrying aloud that Gooden's high-powered rounds might penetrate vehicle armor. (PSR Victim Impact Statement 3). Gooden attempted to convince officers to lower their guard by announcing that he would come out of the house, then opening fire in a cowardly attack on unsuspecting officers. He then fired on Adam Finseth, an EMT providing aid to the injured. Even had these actions taken place in a warzone, they would have constitute a war crime. Gooden had time to surround himself with cannisters of ammunition, a half-dozen firearms, even bottles of Gatorade. He was prepared—and had been equipped by the defendant—for a siege.

No one would deny that Shannon Gooden's actions were evil. He was a serial abuser of multiple victims, Dyrdahl, and he fired over a hundred rounds on February 18 into law enforcement whose only intention was protecting

12

children that Gooden cravenly used as a shield and negotiating chip. He was impossibly cruel, cowardly, and violent. And Dyrdahl knew it. She knew his violent nature, his criminal history, his abusive and erratic tendencies. She herself suffered abuse at his hands. She felt the need to appease him constantly, or he might become violent. (PSR ¶ 19). She even says that her phrasing of text messages to Gooden about the firearms was carefully crafted because if she "was not expressing a sufficient level of joy," he could become physically abusive. *Id*. This man who would strike his romantic partner of eight years if she did not use enough happy emojis, *this* is who Ashley Dyrdahl armed with AR-15-style assault rifles and endless rounds of heavy ammunition. Dyrdahl emphasizes Gooden's grotesque and violent abuses but then claims to be shocked that he would do something grotesque and violent with the arsenal she provided. This account does not ring true. She knew who he was and how dangerous he could be. She did not pull any triggers, but she provided the guns and ammunition and put them in the hands of a violent, dangerous man.

The government acknowledges that Gooden was an abusive domestic partner. Gooden appears to have abused or harmed nearly everyone in his orbit. Dyrdahl points to her fear of further abuse as the reason she felt she had to appease Gooden by purchasing the guns. (PSR ¶ 18-19). This cuts two ways, however: it may mitigate her culpability, but it also means she knew the

13

danger of arming Gooden. In trying to protect herself, she put everyone *else* in danger. And ironically, in seeking to protect herself, she likely put *herself* in the greatest danger. *See* A. Zeioli, R. Malinski, & B. Turchan, Risks and Targeted Interventions: Firearms in Intimate Partner Violence, 38 Epidemiologic Revs. 125 (finding that a woman is five times more likely to be killed by an abusive partner if the partner has a firearm.) But it does not take personal experience to understand that putting a firearm in the hands of a man convicted of a violent felony puts lives at risk. This is the very reason why Congress has deemed violent convicted felons unfit to possess such lethal instruments. *See United States v. Jackson*, 110 F.4th 1120, 1127-8 (8th Cir. 2024). It is a matter of the simplest common sense that providing persons with a history of violence the means to be even more deadly is likely to end in tragedy.

The court's sentence must also grapple with the need for general deterrence and the reality that domestic partners are a primary avenue for violent convicted felons to secure deadly firearms. *See* "Tens of thousands try to illegally buy guns from dealers annually, study finds," *NBC News*, March 11, 2013 (citing ATF statistics showing that 20% of straw purchasers are domestic partners). That domestic partners—primarily women in relationships with violent men—act as straw purchasers is oftentimes what makes these offenses so difficult to prosecute. Violent men choose their wives

and girlfriends as straw purchasers because their partners are easy to control, and the crime is easy to conceal. While the government is not without sympathy for these women, the arming of violent men—so often met with violent ends—must stop. And it will not stop until the public understands that these straw purchases are amplifying violence everywhere, and the straw purchasers themselves *do* bear responsibility. Straw purchasers like Dyrdahl cannot absolve themselves of the violent ends of their purchases.

Congress created Section 932 as a part of the Bipartisan Safer Communities Act to combat and deter the exact catastrophe that occurred in this case. The Act's co-sponsor, Sen. Martin Heinrich, spoke on the Senate floor about the specific aims of the straw purchasing provisions he helped craft:

> Just last year, a New Mexico State Police Officer was tragically killed during a traffic stop in Deming, New Mexico. Officer Darian Jarrott was shot and killed by a convicted felon whose wife had allegedly purchased the gun for him. She is now being prosecuted under the paperwork offense that is currently on the books. But under [this] Act, she would be facing *more severe and deserved consequences for her role in the tragic death of a state police officer*." (emphasis added).

"Heinrich Delivers Remarks on Senate Floor on Bipartisan Safer Communities Act," June 23, 2022 (accessed at https://www.heinrich.senate.gov/newsroom/press-releases/heinrich-delivers-remarks-on-senate-floor-on-bipartisan-safer-communities-act). It is sometimes the case that a defendant is charged with a crime meant for altogether different

circumstances; not so here. Ashley Dyrdahl pleaded to a charge created in response to the precise tragedy that she helped produce. It would defy the very purposes of this legislation to sentence Dyrdahl to less than 41 months—the high end of the applicable guidelines range.

Dyrdahl notes the potential effect of her prison sentence on her children. Yet she fails to acknowledge that her intentionally furnishing an abusive, violent man with lethal firearms easily could have caused the deaths of her children, and the children of Gooden's ex-partner. She appears to be haunted by the horrific question Gooden asked the children that night—did they want to die with him. But she does not carry the terrible thought to its logical conclusion. What if Gooden simply had not asked? Or what if a stray bullet from the shootout had struck one of the children in the home? At no point in her statements in court or in her PSR interview does Dyrdahl consider that her own children could have been killed by the weapons she bought.

It is just as important to note the incalculable damage Dyrdahl's actions caused to the families of these first responders. Dyrdahl understandably worries about the effect this tragedy will have on her children, especially if she is separated them for some time in prison. Yet Dyrdahl's crime has severed these first responders from their families for life. The parents of Paul Elmstrand, Matthew Ruge, and Adam Finseth will not have the luxury of reuniting with their sons after a few short years. The spouses of these brave

men have lost a lifetime of memories and now must raise *their* children without their beloved husbands. Adam Finseth survived two tours in Iraq with the 101st Airborne, only to be murdered in a Burnsville warzone of Dyrdahl's making. (PSR, Victim Impact Statement of TF, Spouse of Adam Finseth). Paul Elmstrand's children—five months and two years old when he was shot down—will never have another moment with their father. (Victim Impact Statement of R.J., Sister of Paul Elmstrand). Beyond their immediate families, this catastrophe devastated an entire community. As one officer who survived that night put it, the "ripple effect of her actions is immeasurable." (PSR Victim Impact Statement of P.G.). The dilemma of Dyrdahl's just punishment being borne by her undeserving children is heartbreaking; it is also of Dyrdahl's own making. Moreover, this sentence cannot place a greater value on reuniting Dyrdahl with her children than on justice for the first responders who died trying to save them. This sentence must principally consider what their children, their parents, their spouses, and their siblings deserve.

Dyrdahl did not have to purchase any firearm for Gooden. She certainly did not have to purchase multiple assault rifles (one with a binary trigger), high-capacity magazines, or countless rounds of high-powered ammunition. After extensive investigation, there is no evidence that any other member of Gooden's family or circle of friends ever illegally furnished him with a firearm. His ex-romantic partner before the defendant never purchased a firearm for

17

him. Gooden became prohibited from possessing firearms in 2008, and all of the evidence shows he never owned a gun until the defendant started buying them for him almost monthly in 2023 and 2024. Paul Elmstrand, Matthew Ruge, and Adam Finseth would still be alive if Dyrdahl had merely done what everyone else in Gooden's life chose to do in light of his desire to own guns: nothing. Frankly, these heroes would still be alive if she had purchased mere hunting weapons or even handguns, instead of multiple combat weapons capable of defeating the tactical armor worn by officers that night. (Victim Impact Statement of Sgt. Adam Medlicott). The specter of Shannon Gooden undoubtedly looms over this entire tragedy, but Dyrdahl cannot shield herself behind it.

The sheer power of the firearms Dyrdahl provided to Gooden, combined with her knowledge of his volatility and violence require a sufficient sentence of imprisonment to reflect her serious culpability in this offense. What is more, the sentence in this case must provide adequate deterrence to all those who continue to illegally place deadly weapons in the hands of the violent and dangerous. As this Court knows, straw purchasing is rampant in the State of Minnesota and throughout the country. Over half of firearms recovered from crime scenes in 2021 bore hallmarks of straw purchases. *See* Protecting America From Trafficked Firearms: NFCTA Updates, New Analysis, and Policy Recommendations, Bureau of Alcohol, Tobacco, Firearms, and

Explosives (accessed at https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking-volume-four). The three first responders killed in this tragedy were nowhere near the first to be murdered with straw-purchased guns. Sadly, they will be far from the last. The sentence in this case must serve as a deterrent against the escalating armament of prohibited violent convicted felons.

## V.    Conclusion

Shannon Gooden murdered three first responders who were attempting to protect the seven children he held hostage. His last acts were unspeakably monstrous. This tragedy would not have occurred without Dyrdahl's repeated choice to arm Gooden with weapons of extreme lethality. In a very real sense Dyrdahl bears direct responsibility for the deaths of Paul Elmstrand, Matthew Ruge, and Adam Finseth. The need for the sentence to reflect the seriousness of her conduct and the need to deter the flow of straw-purchased weapons calls for a sentence of no less than 41 months' imprisonment. The government respectfully requests that the Court sentence the defendant accordingly.

Dated: August 20, 2025      Respectfully submitted,

JOSEPH H. THOMPSON
Acting United States Attorney


*s/Kristian Weir*
KRISTIAN WEIR
THOMAS CALHOUN-LOPEZ
Assistant U.S. Attorneys